```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
REGINA JENKINS,                                             :    MEMORANDUM DECISION
                                                            :    AND ORDER
                                   Plaintiff,               :
                                                            :    19-cv-6040 (BMC)
                 - against -                                :
                                                            :
COMMISSIONER OF SOCIAL SECURITY,                            :
                                                            :
                                   Defendant.               :
                                                            :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Plaintiff seeks review of the decision of the Commissioner of Social Security, following a hearing before an Administrative Law Judge, that she is not disabled as defined by the Social Security Act for the purpose of receiving disability insurance benefits. Plaintiff alleged that the onset date of her disability was March 15, 2010 and that it continued through her date last insured of December 31, 2015. She has a number of impairments, but the most severe involve her hands and right hip.

The ALJ found that plaintiff has severe impairments of arthritis and carpal tunnel syndrome in both hands, degenerative joint disease in her right shoulder and right hip, and lumbar degenerative disc disease. He nevertheless found that she could do "light work" as defined in 20 C.F.R. § 404.1567(b) with a few restrictions. Based on the ALJ's determination that there were available jobs in the national economy that were consistent with those restrictions, he found plaintiff not disabled.

Plaintiff's main point of error is that the ALJ erred in the treatment of two medical source statements from plaintiff's treating physician, Dr. Isaac Cohen.[1]  As plaintiff's primary orthopedist, Dr. Cohen started treating her in 2013, well after her alleged onset date in 2010.  Although plaintiff was diagnosed with carpal tunnel syndrome in 2009, the record contains no evidence of treatment between 2010 and the initiation of her treatment relationship with Dr. Cohen in 2013.

In August 2015, Dr. Cohen had opined that plaintiff could lift and carry only 5 pounds; could stand, walk, or sit for only 2 hours per day; and could stand, walk, or sit for only 30 minutes without interruption.  He thus opined that plaintiff was "totally disabled."  Then, in September 2018, Dr. Cohen opined that plaintiff could stand for 50 minutes at a time with breaks of 30 to 45 minutes.[2]  He further recommended that she not stand for more than 1 hour in an 8 hour day, with frequent periods of rest.  Finally, Dr. Cohen stated that plaintiff's impairments caused her to have difficultly pushing, pulling, handling, and feeling with her hands.  She also had limited capacity for repetitive hand movement.  And she could not pinch or grasp objects with any significant strength.

Based on these assessed "gross limitations in [plaintiff's] ability to stand, walk and use both upper extremities," Dr. Cohen opined that it could "be established with a reasonable degree of certainty that [plaintiff's] conditions are long-standing in nature and developed over an

---

[1] This case involves the "treating physician rule," which "generally commands deference to the medical opinion of a claimant's treating physician, 'who has engaged in the primary treatment of the claimant.'"  Hubbard v. Comm'r of Soc. Sec., No. 18-cv-3119, 2019 WL 3940150, at *9 (S.D.N.Y. Aug. 5, 2019) (quoting Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008)).  Although it was repealed effective March 27, 2017, see 20 C.F.R. §§ 404.1527, 404.1520c, the prior regulations apply because plaintiff filed her claim before that date.  See Hubbard, 2019 WL 3940150, at *9 n. 15.

[2] It is not entirely clear whether Dr. Cohen meant "50" or "15" minutes.  The document referenced here says 50, but other parts of the record say 15.  It is clear from the context that one of the two is a typographical error, most likely the result of oral dictation.

2

extended period of time." He therefore repeated his conclusion that plaintiff was "totally disabled to perform any work activities."

The ALJ gave "little weight" to Dr. Cohen's consistently expressed opinion. After noting that the determination of disability is reserved for the Commissioner, the ALJ emphasized that Dr. Cohen had not referenced any specific vocational limitations. As for Dr. Cohen's function-by-function assessment, the ALJ gave it "some limited weight," given Dr. Cohen's treating history. But the ALJ thought that Dr. Cohen's treatment notes did not reflect the need for the stated restrictions, because plaintiff had intact sensation and strength and a full range of motion in her bilateral lower extremities. The ALJ also thought that Dr. Cohen's opinion was "inconsistent with the very conservative care received over the relevant period," for plaintiff "ha[d] not had any surgical intervention" and had "a wide range of activities of daily living," such as cooking, cleaning, and shopping. Further, one of Dr. Cohen's colleagues, Dr. James Germano, documented pain only in the right hip in March and April 2013, and he "reported that log rolling and movement of the hip no longer produced pain during clinical exams." Finally, the ALJ noted that Dr. Cohen had referenced an MRI that was performed three years after the date last insured.

In determining whether the ALJ's determination is supported by substantial evidence, it is important to note that this case had something that most do not – the treating physician joined issue with the medical expert who testified at the hearing. In the usual case, the treating physician has no knowledge of the results of the examinations and opinions of state consultants – and certainly not of a medical expert who testifies at the hearing based on records. I have previously criticized this practice. See Novaro v. Comm'r of Soc. Sec., No. 19-cv-804, 2020 WL 7643130, at *3–4 (E.D.N.Y. Dec. 23, 2020). Especially where there is no medical expert at

3

the hearing (unlike here), it creates a situation of ships passing in the night – unlike in civil litigation, no expert knows what the competing experts are saying.

In this case, however, there were two hearings, which allowed the treating physician, Dr. Cohen, to review the prior testimony of the medical expert who testified at the first hearing, Dr. Louis Fuchs. When Dr. Fuchs testified at that first hearing, the ALJ found that plaintiff was not disabled, but the Appeals Council remanded for another hearing for reasons not relevant here. Then, plaintiff's attorney provided Dr. Cohen with Dr. Fuchs's testimony and gave him the opportunity to comment on Dr. Fuchs's opinions. Excerpts from Dr. Cohen's answers illustrate the benefits of having an exchange between the experts:

> **[Question #5] Review and comment on Dr. Fuchs['s] report:**
>
> The evaluation of Mrs. Jenkins['s] physical findings as well as the radiographic a workup [sic] is very clear. The significant degenerative changes in both hands[] precluded her from performing any significant activities as both hands were continuously painful and they become more so after any physical activity. She was able to lift no more than 5 pounds [at a] time, with difficulties. She is a right-handed dominant person who has significant pathology about the right shoulder, currently consistent with a full rotator cuff tear, resulting from the progression of the partial rotator cuff tear diagnosed after my initial evaluation [in 2013]. In addition she suffers from significant pathology involving the right hip with chronic limping resulting in secondary back pain. These conditions make her unable to stand for any length of time, walk for more than a few 100 feet, and certainly has difficulty climbing stairs. She is significantly limited in the use of both upper extremities, more severe on the right than the left, as well as having limitations of the right hip with chronic low back syndrome.
>
> **[Question #6] Dr. Fuchs['s] report indicated th[at] Mrs. Jenkins can carry and lift up to 10 pounds continuously and occasionally up to 20 pounds.**
>
> As documented above I strongly disagree with that assessment. The pathology present in the hands is so significant she is unable to pinch or grasp any objects with any significant strength. She is unable to hold any objects that weigh more than 5 pounds. In addition because of the chronic inflammatory process involving the degenerative joint disease of the hands she has developed bilateral carpal tunnel syndrome which is consequential to th[ese] degenerative changes and has exacerbated her disability; therefore, I disagree with the assessment recommended by Dr. Fuchs.

4

> . . . It is my opinion that Ms. Jenkins is only able to carry no more than 5 pounds and she is grossly limited to perform[ing] any repetitive activity with her hands because this would result in intractable pain.
>
> **[Question #8] Dr. Fuchs indicated that there was no neurological deficit [in] the lower extremities.**
>
> The pathology present in the right hip of Mrs. Jenkins is consistent with advanced degenerative arthritis as well as a labrum tear. This is a pathology that is progressive in nature resulting in some limping. And this pain on physical activities such as climbing stairs and prolonged walking is very difficult; however, this is not associated with any acute neurological compromise [as Dr. Fuchs opined] as the involvement is present in the joint and not in both the peripheral nerves. No neurological findings are expected with this type of pathology.
>
> . . .
>
> Because of the pathology present Mrs. Jenkins can stand only up to 15 minutes at [a] time. After . . . 30-45 minutes of rest she can try to stand again for an additional 15 minutes. She is grossly limited in her ability to stand and walk as documented above and this condition is progressive in nature and has been well documented in the records.

In addition to responding to Dr. Fuchs's opinions from the initial hearing, Dr. Cohen was also very specific as to plaintiff's limitations. For example, when asked how long plaintiff could use her hands without pain, Dr. Cohen responded that:

> Mrs. Jenkins develops pain in both hands as soon as she starts using both hands. Any motion of the thumbs is extremely painful. So any pinch activity would result in intermediate pain. In addition because of the carpal tunnel syndrome additional limitation for the use of the hands as documented are noted.

Then, when asked what "objective testing was performed" to confirm his diagnoses, Dr. Cohen stated:

> Mrs. Jenkins underwent multiple radiographic evaluations including x-ray examinations of the hips, pelvis, right shoulder and both hands. In addition multiple MRIs[] examinations were also performed. The MRI examination of the right shoulder demonstrated significant impingement with AC joint arthritis and a partial rotator cuff tear initially. Subsequently repeat testing under the care of Dr. Kiefer a complete rotator cuff tear was diagnosed in 2017, indicating the natural progression of the condition documented.

5

> With regard to the MRI of the right hip this demonstrated superior labral damage with degenerative arthritis secondary to the labrum pathology had also been progressing with the passage of time that is the natural history of this type of injury. The MRI of the lumbar spine was also consistent with degenerative disc disease. The carpometacarpal joint arthritis was clearly demonstrated on a clinical basis as well as on the radiographic studies.

In short, Dr. Cohen vehemently disagreed with Dr. Fuchs, maintaining that plaintiff was "permanently disabled."

At the second hearing, Dr. Fuchs had an opportunity to reply to this critique, yet he did not even review Dr. Cohen's response before that hearing. When plaintiff's attorney asked Dr. Fuchs about the critique at the hearing, the following exchange ensued:

> Q: Dr. Cohen felt that the Claimant was limited to no more than five pounds of lifting and carrying in the hands because in his words greater weight would result in intractable pain. Why do you disagree with him?
>
> A: Well, let's see. Well, it's a matter of degree. Her examination showed some inability to fully bring the thumb to the fifth finger. That is the motion of opposition. And that wouldn't be as lack ability [sic] to fully grasp. So that would impair somewhat her ability to lift heavy weight. And mostly that has some measurement of grasp as sort of like an impression that I had and that impression that [Dr. Cohen] has about how much she can lift. I think utilizing both upper extremities occasionally [she] would be able to lift up to 20 pounds utilizing both upper extremities and the other doctor doesn't feels is that [sic].
>
> Q: Okay.
>
> A: So it's just my impression and that's his impression.

Plaintiff's attorney did not ask Dr. Fuchs any more questions about Dr. Cohen's critique, perhaps because Dr. Fuchs had failed to review it prior to the hearing. And the ALJ didn't ask any more questions of Dr. Fuchs either.

To state the obvious, Dr. Cohen had a much stronger foundation for his views than did Dr. Fuchs. Dr. Cohen, a diplomate of the Board of Orthopedic Surgery since 1977 and a fellow of the Academy of Orthopedic Surgery since 1980, had examined plaintiff at least 20 times at the time he rendered his report. Dr. Fuchs is also an experienced, board certified orthopedic

6

surgeon, but he never examined plaintiff, and he based his opinion solely on written records from other doctors and listening to her testimony.  The case law and common sense are in concert as to which doctor's opinion gets the benefit of the doubt.  See, e.g., Gonzalez v. Saul, No. 19-cv-2946, 2020 WL 7385712, at *2–3 (E.D.N.Y. Dec. 16, 2020).

Of course, that benefit of the doubt applies when all other factors are equal, which is rarely the case.  We therefore need to look at the reasons that the ALJ rejected Dr. Cohen's opinion in favor of that of Dr. Fuchs.  With a couple of exceptions, the ALJ's criticisms do not hold water.

Most importantly, the ALJ found inconsistencies between Dr. Cohen's opinion and the treatment notes from both him and his colleagues.  In the ALJ's view, there was insufficient evidence in these treatment notes to warrant the limitations in sitting, standing, and walking to the extent proposed by Dr. Cohen.  If the treatment notes materially contradicted Dr. Cohen's opinions, that would certainly be a reason to depart from the treating physician rule.  See, e.g., Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 8 (2d Cir. 2017) (summary order).  But in finding inconsistencies, the ALJ focused on a very short period in the course of a lengthy treatment relationship.  Taken as a whole, the opinion and treatment notes weren't really inconsistent.

Specifically, the ALJ referred to treatment notes from other doctors to whom Dr. Cohen had referred plaintiff for particular impairments in March and April of 2013.  Discussing plaintiff's hip impairments, the ALJ found that "[d]espite MRI evidence of degenerative changes at the right superior labrum with tendinosis and slight bursitis, there was no definitive evidence of tearing."[3]  In emphasizing the lack of "definitive" evidence of tearing, the ALJ only partially

---

[3] The labrum is the cartilage around the hip joint.

quoted the notes from the radiology referral that Dr. Cohen had arranged. After performing an MRI on March 15, 2013, the radiologist found: "Intermediate intrasubstance signal is noted within the superior labrum [which] indicates degeneration, without discrete tear, although evaluation for subtle nondisplaced tear is limited without joint capsule distention, particularly along the posterior aspect." As to her "impression," the radiologist similarly stated: "Degenerative signal along the right hip superior labrum without discrete tear, although subtle non-displaced tear, particularly along the posterior portion is difficult to exclude[] without joint fluid and capsule distension[;] correlate clinically and follow-up as necessary."

I discern two things from this. First, the radiologist needed more tests to determine if there was indeed a tear to the labrum, and second, she couldn't rule out that possibility. Additionally, when Dr. Cohen ordered an MRI and referred her to a hip specialist, Dr. Germano, his treatment notes mentioned an "MRI confirmation of labral tear." And Dr. Cohen clearly treated for what he considered to be a labral tear. Those things may not "definitively" tell us if the condition existed in 2013, but they at least strongly suggest that it may have. Moreover, there is nothing in the record by which the ALJ could find that a labral tear is the *sine qua non* of the disabling pain that plaintiff asserted. I see no material contradiction between the evidence cited by the ALJ and Dr. Cohen's opinions.

Similarly, the ALJ cited the treatment notes of Dr. Germano. He saw plaintiff three times: for an initial consultation on March 19, 2013, and again on April 8 and April 30 of that year. Dr. Germano performed steroid injections to treat plaintiff's hip pain. The ALJ emphasized that Dr. Germano "documented reports of pain only at the right hip since March 19, 2013." The ALJ also noted that Dr. Germano observed no hip pain from a "log rolling test," that is, one of a number of manipulative tests that physicians perform on patients' hips to test for

8

impairments of the hip bones or cartilage. The ALJ did not say so expressly, but his point was that Dr. Cohen had previously and consistently found pain from the log rolling test, and thus by the time plaintiff saw Dr. Germano, her impairment had improved.

Again, however, the ALJ's extraction from Dr. Germano's reports was selective. The ALJ did not mention that, on March 19, Dr. Germano also found that plaintiff had a positive FABERs test, another manipulative test for hip impairments. The ALJ also failed to mention that in the same treatment note, under the "Assessment" heading, Dr. Germano stated: "Post hip pain and MRI s[howing] p[o]st labral degeneration – will try intra art steroid inj to dx/tx and possible PT to follow." The final treatment note from Dr. Germano, from April 30, continued to show a positive FABERs test and a negative log rolling test. In short, both Dr. Germano and Dr. Cohen thought plaintiff's hip pain was severe enough to warrant steroid injections.

The ALJ also discounted Dr. Cohen's opinion because Dr. Germano "failed to find greater abnormalities that would significantly impair [plaintiff's] mobility or [her] ability to sit for extended periods." Again, the ALJ did not say so expressly, but his point seems to be that the injections brought plaintiff relief as to her hips. The record is clear on that. When plaintiff returned to Dr. Cohen two weeks after her last visit with Dr. Germano, Dr. Cohen noted that plaintiff's "hip condition [was] much improved with injections." But the ALJ did not mention that plaintiff again had pain from the log rolling test. Dr. Cohen's assessment was also that "hand pathology got worse" and there remained "severe limitation of both hands." He noted that plaintiff "may still need[] additional treatment, including hip surgery."

When plaintiff returned in September, Dr. Cohen noted that "the hip pathology has slightly improved after the injections but she still has pain [and she] remains disabled." Dr. Cohen then assessed that "[i]ntertrochanteric bursa is now symptomatic," indicating that there

9

was inflammation of the fluid-filled sac that cushions the hip. Later, the focus of plaintiff's treatment shifted from her hip to her hands, though the hip arthritis continued.

It seems to me that none of these findings are inconsistent with Dr. Cohen's medical source statements to a level that would allow the ALJ to disregard Dr. Cohen's detailed functional assessments, as the ALJ effectively did. Not every treatment note had to parrot all of its predecessors to sustain Dr. Cohen's opinions. If the focus shifted to plaintiff's hands in 2014, it is perfectly plausible that the continually creeping arthritic degeneration of her hands overshadowed the pain in her right hip. Nor is there anything in the record that would make it unusual for plaintiff's impairments to wax and wane. Since I cannot see a material inconsistency between Dr. Cohen's opinions and the treatment notes, we need to consider the other reasons that the ALJ discounted Dr. Cohen's opinions.

The ALJ also focused on plaintiff's activities of daily living, which he took exclusively from her disability application. The ALJ stressed that plaintiff could cook, clean, shop, do laundry, and perform childcare. Plaintiff was also "self-sufficient in personal care" and could drive a car. Finally, the ALJ noted that plaintiff enjoyed waterskiing, gymnastics, and tennis. However, as the ALJ acknowledged elsewhere (at least in part), that is not what the record really shows.

First, the fair inference from plaintiff's disability application is that plaintiff is not currently waterskiing, playing tennis, or performing gymnastics. Of course plaintiff could not receive disability benefits if she were engaging in those activities. But plaintiff was speaking historically of what she used to be able to do before her degenerative musculoskeletal disease reduced functional capacity to the level shown in Dr. Cohen's reports.[4]

---

[4] The application first asked, "What are your hobbies and interests?" Plaintiff responded, "waterskiing, tennis, gymnastics." Then the application asked, "Describe any changes in these activities since your illnesses, injuries or

Similarly, at the hearing in 2015, plaintiff gave more insight into how she manages her activities of daily living. Her testimony was not inconsistent with the list of activities in her disability application, but it did show how difficult it was for her to perform those activities. Here are excerpts from her answers at the hearing:

> Q: Well, can you button a button?
>
> A: I wear snaps to avoid the buttons. Buttons cause pain. I pretty much -- I'm building my life over the past five years to limit the amount of pain I get every day from simple things like jelly. I don't buy giant jars of jelly from Costco anymore. I buy lightweight, little ones or squeezy ones that are easier to use and twist tops. I'm building my life around hands.
>
> Q: Can you open up a jar?
>
> A: I try. I get help from my husband. I even tried using jar openers which are actually worse on the hand.
>
> Q: Can you take change off of a table easily?
>
> A: No. I usually drop it.
>
> Q: Can you open up a heavy doorknob going into a house or a room?
>
> A: I mean look, if I had to get out of the door I could open it but it hurts. I prefer that type of handle to a knob because I can use this finger, you know I swipe a lot.
>
> Q: If your husband is barbecuing and he makes a nice steak for you, can you cut it with a fork and knife?
>
> A: No, I have him cut my steak.
>
> Q: Okay. How about if you have to write a note for someone? You have children. If you have to write a note for the kids or something like that.
>
> A: Well, nowadays the notes are -- you can do them electronically or you know by dictating through Siri. But there are little boxes on notes that say you know my child is absent. I can check that.
>
> Q: Okay. Can you write a --

---

conditions began." The photocopy of plaintiff's answer in the record is too poor to read, but a reference can be seen to "sports." I think the inference is unavoidable that, in the illegible answer, plaintiff made it clear that she no longer pursues those hobbies and interests because of her impairments.

11

A: I couldn't write --

Q: -- note to -- a personal note?

A: No.

Q: Okay.

A: I can sign my name still.

Q: How about -- your job had a lot of computer work?

A: My life was built around computer work.

Q: Can you sit at a computer and type an email or Google search something or --

A: I use -- I just recently bought an iPhone, probably six months ago because I can't text. So when you use Siri you use the microphone and she'll dictate and take my messages for me which is great but I can't spend any amount of time on a computer or on a keyboard. I get up to stretch my leg.

Q: The problem with your hands, is it principally your thumbs or is it all your fingers or --

A: The basal thumb joints have no cartilage. I have bone spurs I think on both hands. I have carpal tunnel syndrome and I have a wicked tightness all around the wrist. You know as a result of I guess compensating for the injury in the thumbs.

An ALJ obviously does not have to credit everything a claimant says. And if a claimant says one thing in her application and another in her testimony, the ALJ need not credit the more limited description in her testimony. But an ALJ cannot extract the short-answer questions from a disability application and then ignore the more robust answers that oral testimony allows.

Significantly, the only questions the ALJ asked plaintiff were about her past employment, allowing him to satisfy the inquiry that she could not perform her past relevant work. He did not ask her any questions about her activities of daily living or her description of them in her application. But based on her answers to the questions at the hearing by her attorney, it seems clear that whatever her activities, they are quite limited. Thus, once again, when I combine the activities of daily living described in her application with those described in her testimony, I do

not see a material inconsistency between her self-reporting and Dr. Cohen's opinions of her functional capacity. It does not justify giving his opinion little weight.[5]

Another reason the ALJ discounted Dr. Cohen's opinions was because plaintiff had received only "conservative" care. Her care consisted of physical therapy, non-opioid prescription pain medication, hip injections, and a home exercise program. I agree with the ALJ that plaintiff's care is properly characterized as conservative. But the fact is that multiple doctors thought plaintiff would eventually require surgery. As Dr. Cohen stated in his answers to the questions posed by plaintiff's attorney: "Her prognosis is poor. She will require multiple surgical procedures which have been offered to [her] since the initial workup was completed." Dr. Germano likewise noted that he discussed the risks and benefits of surgical procedures.

Patients often put off these serious surgeries for both emotional and practical reasons – the surgeries don't always work, and even if they work, they may not last forever. That is why a "conservative course of treatment . . . does not provide a good reason for rejecting the treating physicians' opinions." Morris v. Colvin, No. 15-cv-5600, 2016 WL 7235710, at *9 (E.D.N.Y. Dec. 14, 2016) (internal quotation marks omitted) (citing Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000)). As plaintiff testified with regard to her hand impairments:

> Q: And Dr. Cohen or any other doctors treating you, have they recommended surgery? Have they --
>
> A: They've asked if I would consider it, however they told me that you know the success rate is not that good. It's not going -- and it may not necessarily fix the problem and the problem could get worse and I'm afraid of that.

She similarly testified with respect to her hip impairment:

> Q: Okay. Does anything relieve the hip -- you took injections in the hip?

---

[5] I see one probable inconsistency between Dr. Cohen and plaintiff. In plaintiff's 2013 disability application, when asked to explain how her conditions affected her ability to sit, plaintiff answered, "N/A." In his 2015 medical source statement, however, Dr. Cohen opined that plaintiff was limited to sitting 1-2 hours in an 8 hour workday and up to 30 minutes at a time. This single inconsistency is not sufficient to disregard Dr. Cohen's overall opinions.

> A: I took an injection in the hip once and it definitely relieved the pain. But the injection itself is very painful and three days, four days afterwards I was still in pain. It actually hurt worse. Then I got relief. I feel like I want to go back and get another one but I keep putting it off because I'm afraid of going through that procedure again because --
>
> Q: And --
>
> A: -- it really hurts. I mean the needle is this long.
>
> Q: And they've talked to you about surgery for the hip?
>
> A They did. I, in fact, wanted surgery for that as well and they told me . . . that I was too old for labrum surgery, soft tissue surgery, and that I should just leave it alone, wait for -- basically it lubricates the joint and the joint eventually won't get the lubrication over time that it needs and so he said I'll probably have a hip replacement you know in ten years or whatever he said. Seven to ten years or something.

I think this is a good explanation of why, at this point, plaintiff's care has been conservative, and it does not seem inconsistent with Dr. Cohen's opinions. If there will likely come a time when she will not be able to postpone more invasive treatment, the fact that she is not there at the moment does not mean that Dr. Cohen's opinions are wrong. An applicant for disability "need not be completely helpless or unable to function." De Leon v. Sec'y of Health & Hum. Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Ed. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

Finally, the ALJ relied on the opinion of the examining consultant, Dr. Andrea Pollack. No doubt, acceptance of Dr. Pollack's opinion would require a finding of non-disability, as she opined that plaintiff had only "mild restriction[s] in lifting, carrying, pushing, pulling, and use of the hands." And unlike Dr. Fuchs, she at least physically examined plaintiff. However, the hesitation required in comparing treating physician opinions to non-examining medical experts applies almost equally to consultants who see the claimant only one time. That hesitation is particularly applicable here, where Dr. Pollack is not an orthopedist and gave no indication that

14

she reviewed any of Dr. Cohen's treatment notes or any of plaintiff's MRIs, x-rays, or other objective evidence.

In short, I do not see the other evidence of record as substantial enough to overcome the treating physician rule. To the extent the Commissioner might complain that my analysis set forth above constitutes a re-weighing of the evidence, I would disagree and submit that the treating physician rule itself requires a reviewing court to assess whether the evidence relied on by the ALJ is sufficient to overcome that rule. See generally Hubbard, 2019 WL 3940150, at *9. My conclusion is that the ALJ's analysis emphasized only those portions of the record that might favor a finding of non-disability while not recognizing that there was, indeed, objective medical testing that supported Dr. Cohen's conclusion.

Plaintiff has not just asked for a remand for another hearing, but for a determination of benefits only. Although the statute gives this Court the authority to order that, the case law is clear that it is the exception rather than the rule. See, e.g., Staib v. Colvin, 254 F. Supp. 3d 405, 407 (E.D.N.Y. 2017). It is tempting to do that here for the reasons plaintiff points out – she filed her application in 2013 and has been through two hearings and two appeals, one at the administrative level and now another one here. These cases take long enough to decide at every level and I am reluctant to put plaintiff or the Commissioner through another round of hearings and review proceedings. See Butts v. Barnhart, 388 F.3d 377, 387 (2d Cir. 2004) (noting the "often painfully slow process by which disability determinations are made" and that "remand for further evidentiary proceedings (and the possibility of further appeal) could result in substantial, additional delay"), as amended on reh'g in part, 416 F.3d 101 (2d Cir. 2005).

Nevertheless, there is a question that needs further review by the ALJ. It is clear that plaintiff had insufficient residual functional capacity to work when she started seeing Dr. Cohen

15

on February 27, 2013, and I will direct that she receive benefits retroactively from that date. But she is claiming an onset date of March 15, 2010, and it is not clear that she was disabled on that date. Plaintiff's conditions, as Dr. Cohen has pointed out, are degenerative, and plaintiff is claiming an onset date prior to his treatment of her. Dr. Cohen did not select a specific date when her residual functional capacity became as limited as he found it in 2013. And the record contains no evidence of treatment between 2010 and the initiation of the treatment relationship with Dr. Cohen in 2013. Although Dr. Cohen stated that plaintiff "started developing symptoms involving the hands as well as the right hip[] at least 9 years prior to [his] evaluation," the basis for that opinion appears to be solely plaintiff's self-reporting, and I cannot deem that sufficient.

Therefore, on remand, the Commissioner is directed as follows: (1) calculate and pay benefits from February 27, 2013 and (2) hold another hearing before an ALJ to determine whether plaintiff's proper onset date was February 27, 2013; or March 15, 2010 as she alleged in her disability application; or some date between those two. In making that latter determination, the ALJ shall consider the medical record prior to March 15, 2010 and after February 27, 2013 (the "gap period") to the extent each reflects on plaintiff's impairments after or before those dates, respectively. In addition, as to the activities of daily living listed in plaintiff's application, the ALJ shall (if plaintiff's attorney does not) inquire further of plaintiff's answers to those questions in the disability application, with specific reference to her statements therein as applicable to the gap period.

The Commissioner's motion for judgment on the pleadings [16] is therefore denied and plaintiff's motion [14] is granted to the extent set forth in the preceding paragraph. The case is

16

remanded to the Commissioner pursuant to 42 U.S.C. § 405(g) for an additional hearing and determination consistent with this decision.

**SO ORDERED.**
　　　　　　　　　　　　　Digitally signed by Brian M. Cogan
　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　U.S.D.J.

Dated:　Brooklyn, New York
　　　　　March 28, 2021

17